Doris WEEVER, Appellant,

v.

Bobby Gene WEEVER, June Weever, and Hazel Weever, the same person as Hazel Weever Riesinger, the same person as Hazel Weever Haney, Appellees.

No. 50268.

Court of Appeals of Oklahoma, Division No. 2.

March 28, 1978.

Released for Publication by Order of Court of Appeals April 20, 1978.

David W. Jackson, Schuman, Milsten & Jackson, Tulsa, for appellant.

G. Raymond Bassmann, Bill R. Scarth, Bassmann, Mayberry, Scarth & Murray, Claremore, for appellees.

BRIGHTMIRE, Judge.

Claiming she owned an undivided one-third interest in 120 acres of Rogers County, Oklahoma land, Doris Weever brought this action to, so far as is material here, quiet her title, obtain a partition of the land, and require cotenants to account for

profits they may have realized from using the land. The defending cotenants filed a lengthy answer which in effect denied plaintiff was entitled to any such relief as requested and by way of a cross-petition asked that title to subject land be quieted in them, the defendants, and that Doris Weever be ejected therefrom. After hearing evidence the trial court did just that and she, plaintiff, appeals.

## I

To understand the nature of the controversy and how it came about narration of certain orientational facts is necessary. In 1924 and 1925 Bates Weever, father of Doris Weever's deceased husband Ray, bought the 120 acres in question. In 1930 he conveyed a life estate in the tract to his wife, Adella, and the remainder to his daughter Hazel Weever Riesinger, his son Ray, and his grandson Bobby Gene Weever (surviving child of Bates's deceased second son).

Adella permitted the remaindermen to use the land through the years. One of the first things they did was to orally agree to partition their interests in kind with Hazel taking the west 40 acres, Ray the middle 40, and Bobby the east 40. In 1966, according to Bobby, he and Ray entered into an oral contract in which Ray agreed to sell his interest in the land to Bobby for about $200 an acre payable at the rate of at least $50 a month with the further understanding Bobby would make further payments if needed by Ray and that he would take care of Ray's funeral expenses.

Bobby began making payments October 31, 1966, according to copies of cancelled checks in the record, and continued to make them until March 1974 when Ray died. By that time Bobby had paid Ray more than $8,000. Later Bobby paid $2,154.40 for Ray's funeral.

In the meantime on March 18, 1971 Ray went through the form of a ceremonial marriage with Doris Stevens and began living in a mobile house on a "2 or 3 acre tract" fenced off at the south end of Ray's 40.

Adella, the life tenant, died in June 1973. The following November Ray by quitclaim deed conveyed all of his interest in his 40-acre tract to his nephew Bobby. March 20, 1974 Ray died and on June 19, 1974 his widow commenced this action.

## II

In her petition Doris sought the quieting of title in her to an undivided one-third interest in the 120 acres, which she alleged descended to her upon the death of Ray, and for a partitioning of the property. She alleged also that she was possessed of homestead rights in the tract inasmuch as she and Ray resided on it.

Defendants, in an amended answer, denied Doris's averments and countered with some of their own saying defensively that (a) they did not think she was validly married to Ray because of a previous undissolved common-law marriage to one Edward Fury; (b) the three remaindermen were not tenants in common because they orally partitioned the property prior to June 1973 as a result of which title to the middle 40-acre tract was vested in Ray; and (c) in 1966 Ray and Bobby entered into an oral agreement under which Ray's 40 acres were sold to Bobby for the consideration mentioned earlier, which contract was substantially performed by the time Ray married Doris in 1971 and was consummated by deed executed by Ray to Bobby in 1973 a few months after the death of the life tenant, Adella.

At trial, which featured the testimony of several witnesses, the court found that the remaindermen had orally partitioned their interests in kind and that the sale of Ray's interest to Bobby had been substantially completed by the time Ray married Doris so that there was no interest remaining in Ray at the time he and Doris began living on the tract in question to which a homestead interest could attach.

## III

Doris raises some six points of error the commission of which are said to have caused her defeat. First she says the remaindermen's purported oral partition is

void and therefore inoperative because (1) to have done so would have been to agree to sell the land and such an oral agreement is rendered invalid by the statute of frauds, 15 O.S.1971 § 136.

With reference to the statute of frauds contention appellant recognizes this court is committed to the rule that a partition of land is not a sale of it within the meaning of the frauds statute but merely an allocation by designation of a certain part of the commonly held land to each of the tenants in common—*Anderson v. Anderson*, Okl.App., 521 P.2d 437 (1974)—but she insists this decision is unrealistic and prone to breed the very fraud the statute is intended to prevent.

We have reexamined *Anderson* and find no sound basis for departing from either the result or the reasoning. Appellant admits Ray had always referred to the middle 40-acre tract as his ever since she had known him and this coupled with other evidence warranted the trial court's finding that the remaindermen had indeed orally partitioned in kind their interest in the land many years before Doris married Ray.

Her other attack on the oral partition is that even if the partition was not a sale, it was a conveyance of an interest in realty and had to be in writing within the contemplation of 16 O.S.1971 § 4. We do not find this argument persuasive. While it is true that to be binding on an innocent third party, the partitioning will ultimately have to be consummated by an exchange of recorded deeds, the fact remains that the partitioning agreement is not in itself a conveyance but a remedial proceeding created specially for relieving plural undivided landowners of the potential inconveniences and incompatibilities which are uniquely inherent in such status. *Little v. Penney*, Okl.App., 517 P.2d 809 (1973). We are satisfied that partitioning of plural land ownership is not a "deed, mortgage or other conveyance relating to real estate or any interest therein" within the contemplation of 16 O.S.1971 § 4.

Partition of land in kind is favored by courts. *Chesmore v. Chesmore*, Okl., 484 P.2d 516 (1971). So is extrajudicial settlement of controversies. *St. Louis & S. F. R. Co. v. Chester*, 41 Okl. 369, 138 P. 150 (1914). Although the remaindermen here probably could not have obtained a compulsory or judicial partition of the land prior to their mother's death,[1] still we cannot think of a good reason why they should not be able to agree among themselves to partition their potential possessory rights in kind. If an accord they did reach it is a binding one and the parties and their informed privies are estopped to repudiate it.

IV

Appellant's second contention is that she "has valid existing homestead rights in an undivided one-third interest in the 120-acre tract."

As appellant says, there appears to be no question about the fact that a married cotenant may create homestead rights in the common land by living on it and claiming the residence as homestead. *Lehman v. Tucker*, 176 Okl. 286, 55 P.2d 62 (1936); *Hein v. Wahl*, 170 Okl. 402, 40 P.2d 683 (1935). Here argument is that she and Ray lived on the land after marrying in 1971 and although they were gratuitous tenants at will prior to the death of the life tenant, Ray became tenant in common in the entire 120-acre tract upon his mother's death and at that moment a homestead right came into being and fastened itself onto all of Ray's interest.

Several serious questions emerge in analyzing the theory. In the first place by the time the life tenant expired two significant things had happened, namely, the parties had orally partitioned their interest in the land in kind as a result of which Ray had a remainder interest in only the middle 40 acres; and this he in turn sold to Bobby Weever in 1966—a sale which Doris condemns as void in a later proposition.

Beyond these two matters lies the question of whether Ray claimed any part

1. See reasoning and conclusion of *Little v. Penney, supra* with reference to reversionary interest.

of the land as homestead and if so how much. We know that the right to select certain realty as a homestead is in the owner. *Exchange Nat'l Bank v. Rose,* 187 Okl. 481, 103 P.2d 496 (1940). We also know that a wife cannot establish homestead rights on land owned by her husband without his approval. *Henseley v. Fletcher,* 172 Okl. 19, 44 P.2d 63 (1935); *Jefferson v. Henderson,* 140 Okl. 86, 282 P. 677 (1929); *Tiger v. Ward,* 60 Okl. 36, 158 P. 941 (1916).

■ With this in mind we turn to the facts. Neither Ray nor Doris, of course, could have impressed any part of the 120 acres with homestead rights while the life tenant was alive. If such rights came into existence at all it had to be after the mother died in June 1973. Ray, so far as the record discloses, never made any kind of a declaration of an intent to establish a homestead on any of the land. Moreover his conduct contraindicated such an intent, namely, the act of selling all of his interest in the land to Bobby in 1966. Whether enforceably valid or not, the sale was an act inconsistent with an intent to eventually establish homestead rights on the land. Ray's failure to repudiate or attempt to repudiate the oral sale after marrying Doris is another negative factor. And then finally the execution of a quitclaim deed to Bobby with the intent to divest himself of all his interest in the acreage demonstrated rather conclusively, it seems to us, that he had never consented to impressing the land with homestead rights.

### V

The third proposition is that Ray's oral sale of his interest in the land to Bobby is made void by the statute of frauds. Appellant acknowledges that a memorandum or other writing signed by the party to be charged is sufficient to save the transaction from the statutory inhibition, and so is partial performance of the agreement. *Claiborne v. Claiborne,* Okl., 467 P.2d 157 (1970). She contends, however, that the purchase price checks are insufficient because they do not contain essential descriptions required by *Anderson v. Garrison,* Okl., 402 P.2d 873 (1965), *i. e.,* of the parties, the property, the price, and all the terms. And, she continues, so far as partial performance is concerned its sufficiency must be determined as of "the time of the appellant's marriage to Ray Weever because it was at this time that the appellant's homestead rights were created in the property."

The trial court's finding that the oral sales contract had been substantially performed on Bobby's part prior to Ray's marriage to Doris is not, in our opinion, clearly against the weight of the evidence. In evidence was a series of cancelled checks which on their face showed monthly payments of around $50 were made by Bobby to Ray for "Farm Land" beginning October 31, 1966. The amount paid on the land by March 18, 1971 (the marriage date) was $2,879.50. By the time the life tenant died on June 1, 1973 Bobby had paid Ray a total of $7,064.50—very close to initial $200 an acre purchase price. In October 1973 the payments reached $8,000 and Ray executed a quitclaim deed of his interest in the tract to Bobby. At that point there is more than substantial part performance—there is a substantially executed agreement.

■ Partial performance vitalizes a void oral contract to convey real estate. *Stinchcomb v. Stinchcomb,* 207 Okl. 59, 246 P.2d 727 (1952). And a parol pact which gives birth to a deed escapes the fraud statute's nullifying effect by merging into the written instrument. *Kirkpatrick v. Jacobson's Lifetime Bldgs., Inc.,* Okl., 467 P.2d 489 (1970). These judicial precepts prevent us from condemning the trial court's legal conclusion that performance resurrected the lifeless realty transaction following its statutory crucifixion.

### VI

■ The fourth point argued by Doris is that the deed covered homestead property and it is therefore void because she did not join in its execution. Of course, the general principle of law advanced by Doris—a deed to homestead property is not valid unless signed by both husband and wife—is correct but it is without applicability here because of our earlier conclusion that she failed to prove the establishment of a homestead in the first place.

## VII

■ Appellant's last proposition is concerned with the propriety of being prevented from getting before the court evidence aimed at impeaching Bobby Weever's testimony and throwing light on Ray's intended use of the property after 1971.

What happened was that Doris, in an effort to cast doubt on Bobby's testimony that the checks he wrote were payments on Ray's interest in the 120 acres, asked Bobby during cross-examination to admit that he had bought other land from Ray. Bobby denied that he had. Later Doris offered as a rebuttal witness a woman, Margaret Zimmer, who said she was in the real estate business and had been a good friend of Ray during his lifetime. She said that in 1971 she talked to Ray's sister, Hazel, about fixing a deed for Ray to sign conveying 25 acres located near some property the witness owned which she thought was owned by Ray with title in Hazel's name. Hazel, according to the witness, said at that time that if Ray sold the land it would be to Bob Weever—that it "would never leave the Weevers' hands." The court refused, because of it being hearsay, to allow the witness to testify concerning such conversations. Later on Doris offered to further prove through the witness that Ray "planned to fence the middle 40-acre section, that he planned to put cattle on the land, that he planned to finance the improvements of his house to be financed [sic] through the sale of property in the north 150 acres." Doris argues the proffered proof was admissibly material evidence of Ray's intent "to establish homestead rights in the middle 40-acre tract."

We can find nothing reversibly wrong so far as the trial court's evidentiary rulings are concerned. The attempted impeachment of Bobby Weever failed not because of exclusionary rulings but because of the lack of contradictory evidence. The tendered testimony of witness Zimmer is far too vague and uncertain to gain status as probative evidence that Ray owned land other than the 40 acres in question—a fact which, if it were established, would not of itself contradict Bobby's positive testimony regarding the oral sale; nor would it impeach his denial of having bought any other land from Ray—and it is completely worthless as evidence bearing on Ray's intentions regarding the establishment of a homestead. In other words the testimony, had it been otherwise admissible, might be considered relevant but not material. The offer of proof concerned a statement by Ray in 1971 that he planned to build a house on his 40 by selling some property in the north 150 acres. Appellant realizes this is rank hearsay but says it should have been admitted anyway to show a "state of mind" as was done in *Smith v. Munger*, Okl.App., 532 P.2d 1202 (1974) and the "character" of Ray's possession. *Harmon v. Kerns*, 169 Okl. 290, 36 P.2d 898 (1934). The answer to this suggestion is that no matter what Ray's mental ruminations were in 1971 they could not alter the character of his possession of the 120 acres from what it in fact was—a remainderman occupying the land at the will of the life tenant. And as we said earlier the proposed proof is not sufficient to support a finding that Ray owned 150 acres of land somewhere in 1971; it does not impeach Bobby's testimony that he never bought any property from Ray except the 40 acres; nor does it furnish a foundation for finding that Ray did in fact declare he was claiming homestead rights in the 40-acre tract in 1973 after his mother died.

This case was tried to the trial court and as a practical matter we can infer that he did not highly regard Zimmer as a witness, particularly coming into the proceedings on rebuttal as she did; otherwise he may have been prone to admit the rejected testimony under the notorious "for whatever it is worth" rule.

We hold appellant has failed to demonstrate reversible error in the record.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.